## GRANNIS v. QUINTARD.[1]

(Circuit Court, N. D. Illinois. July 24, 1895.)

CONTRACTS—INTERPRETATION—SALE OF BONDS.

A. agreed to deliver to B. a certain number of state bonds. At that time the bonds were not issued, but an act authorizing the issuance of such bonds, to bear interest at a rate not exceeding 4 per cent., had been passed, and both parties supposed that the bonds would bear that rate of interest, though the agreement said nothing about the interest. Afterwards the bonds were issued, bearing interest at 3½ per cent. *Held*, that a delivery of such bonds was a compliance with the agreement.

Bill of interpleader by William C. D. Grannis against William L. Quintard and Joseph M. Bailey, Jr. The latter defendant having died pending suit, his executors, Joseph M. Bailey and James H.

1 Reported by Louis Boisot, Jr., Esq., of the Chicago bar.

Stearns, were substituted as parties defendant in his stead. There was an interlocutory decree allowing interpleader, and thereupon an issue was made up between the defendants.

Henry M. Bacon, for W. I. Quintard.

F. W. S. Brawley, for J. M. Bailey, Jr.

SHOWALTER, Circuit Judge.    By a statute of the state of South Dakota approved January 15, 1890, provision was made for an ascertainment and division between the states of North Dakota and South Dakota of the floating debt of the territory of Dakota.    Section 3 of said statute is in words as follows:

"When the amount of the floating indebtedness of the territory of Dakota which the state of South Dakota is to assume shall be determined and approved, as above provided, then the state treasurer shall be, and he is hereby authorized and empowered to refund such portion thereof as is evidenced by funding warrants of the territory of Dakota, by exchanging therefor bonds of the state of South Dakota bearing interest at a rate not to exceed four per cent. per annum, payable semi-annually in the city of New York, such bonds to be executed by the governor and state treasurer, and attested by the secretary of state, under the great seal of the state, and running not to exceed twenty years. Any premium received by the state treasurer in making such exchange shall be covered into the general fund of the state of South Dakota."

In the fall of 1889, J. M. Bailey, Jr., who died pending this litigation, and who is now represented by the defendant executors, Joseph M. Bailey and James H. Stearns, had become the owner of three funding warrants issued by the territory of Dakota, each for $50,-000, and each then payable and drawing interest at 7 per cent. per annum.    This $150,000 constituted the portion of the floating debt "evidenced by funding warrants of the territory of Dakota," as expressed in the above statute.    On April 28, 1890, the following writings between J. M. Bailey, Jr., who then lived in South Dakota, and defendant, Quintard, a New York bond dealer, were made at Chicago:

"Chicago, April 28, 1890.

"I hereby agree to pay draft of J. M. Bailey, Jr., for amount of face and accrued interest of funding warrants, numbered three (3), four (4), and five (5), respectively, of the territory of Dakota (face of said warrants being $50,-000 each), provided such warrants, duly assigned to me, are attached to said draft, and provided, further, that said Bailey shall furnish certificates of a responsible bank or banks that, if bonds of the state of South Dakota are not delivered to me on or before August 1, 1890, in accordance with bond of said Bailey to me of even date herewith, then said bank or banks will furnish money to buy from me said warrants, at their face and accrued interest, on August 1, 1890.

"[Signed]                                                    W. I. Quintard.

"I hereby agree to sell said warrants to said Quintard at face and accrued interest, in consideration of twelve thousand dollars ($12,000) paid this day to W. C. D. Grannis, president, in escrow, under certain conditions.

"[Signed]                                           J. M. Bailey, Jr.

"Know all men by these presents that I, J. M. Bailey, Jr., of Minnehaha county, state of South Dakota, am bound and firmly held unto W. I. Quintard, of the city of New York, in the penal sum of twelve thousand and two hundred and ten ($12,210) dollars, good and lawful money of the United States, for the payment of which I bind myself, my heirs, executors, and administrators, firmly by these presents. Witness my hand this 28th day of April, A. D.

1890. The condition of the above obligation is such that whereas the above-bounden J. M. Bailey, Jr., has this day sold to said W. I. Quintard three funding warrants of the territory of Dakota, of fifty thousand ($50,000) dollars each, numbered respectively three (3), four (4), five (5); and whereas, said funding warrants are exchangeable for bonds of the state of South Dakota under and by virtue of an act of the legislature of said state, entitled 'An act to provide for the funding of the outstanding indebtedness of the state of South Dakota, approved January 15, 1890,' such exchange to be made upon conditions more specifically set forth in said act: Now, therefore, if the said bounden J. M. Bailey, Jr., shall deliver or cause to be delivered to said W. I. Quintard, or his assigns, on or before the first day of August, A. D. 1890, bonds of the state of South Dakota, issued in accordance with the said act of the legislature, and conforming thereto in form, manner of execution, date, and payment of interest and principal, rate of interest, and duration of bonds, together with papers showing the legality of bonds, then this obligation to be void, otherwise to remain in full force and effect. Provided, however, that in case the said bounden J. M. Bailey, Jr., shall deliver to the said W. I. Quintard bonds in a less amount than one hundred and fifty thousand ($150,000) dollars (it being expressly understood that he shall deliver all of the bonds of the state of South Dakota issued under the provisions of this act), then the above obligation shall be binding in such proportion of said twelve thousand two hundred and ten dollars ($12,210) as the portion of said one hundred and fifty thousand ($150,000) dollars of bonds which said J. M. Bailey, Jr., does not deliver bears to the whole one hundred and fifty thousand ($150,000) dollars of bonds.

"[Signed]                                    J. M. Bailey, Jr."

Bailey and Quintard then made and delivered to complainant Grannis, together with a copy of the bond last recited, a paper in words following:

"Chicago, April 28, 1890.

"W. C. D. Grannis, Esq., President Atlas Nat'l Bank, Chicago—Dear Sir: We hand you herewith copy of bond this day made by J. M. Bailey, Jr., to W. I. Quintard, also check for twelve thousand ($12,000) dollars of said W. I. Quintard, payable to the order of said J. M. Bailey, Jr. Said check is to be turned over to said J. M. Bailey, Jr., upon the furnishing to you of satisfactory evidence that said W. I. Quintard has paid or caused to be paid to the Illinois Trust and Savings Bank, of Chicago, the face value and accrued interest of three funding warrants of the territory of Dakota for fifty thousand ($50,000) dollars each, numbered, respectively, three (3), four (4), and five (5); and said check is to be delivered only upon the deposit with you of bank stock or mortgages, or both, which shall be fairly worth not less than twelve thousand ($12,000) dollars. Said mortgages or bank stock, or both, are to be held by you in escrow until the conditions of bond of said J. M. Bailey, Jr. (a copy of which is hereto attached) are fulfilled; and, when said conditions are fulfilled as aforesaid, said mortgages or bank stock, or both, are to be returned to said J. M. Bailey, Jr. It is expressly understood, as a condition precedent of said escrow, that said check of $12,000 shall be duly honored by bank upon which it is drawn, upon presentation thereto.

"[Signed]                                    J. M. Bailey, Jr.
                                             "W. I. Quintard."

The officials of South Dakota at first construed the statute above quoted to mean that they could issue bonds and sell them at auction, and out of the proceeds pay the above-mentioned warrants. Following out this idea, the first intention on the part of said officials, or some of them, appears to have been to issue 4 per cent. 20-year bonds, and sell the same at public auction. This plan was carried out to the extent of making a draft of the proposed bonds and putting the same into the hands of a printer, and in advertising the proposed sale. But no such issue or sale of bonds was ever made.

Bailey, or some one on his behalf, insisted that within the sense of the statute the bonds ought not to be sold, but should be turned over to the holder of said warrants in exchange therefor. The state officials apparently inclined to this view of the statute. At all events, they issued bonds applicable to these warrants,—to the extent of only $125,000, however, instead of $150,000,—payable in 20 years, and drawing interest at 3½ per cent. per annum, instead of 4 per cent. per annum. On July 22, 1890, and within due time after the issue of said bonds, Bailey, who, upon satisfactory voucher, had obtained possession of said bonds from the state authorities, tendered the same to Quintard at New York City, together with $2,035 cash. that being the appropriate rebate on the $12,210, as mentioned in the final paragraph of the bond. Quintard, who then held the three warrants pursuant to the writings above recited, refused this offer, and thenceforward persisted in refusing, insisting that the bonds should have been for 4 per cent. per annum, instead of 3½ per cent. On January 2, 1891, by writing sent and duly received, the treasurer of South Dakota gave notice to Quintard that warrants 3 and 4 were to be paid on presentation, and that $15,141,61 would be paid on warrant number 5 on presentation, and that all interest on the moneys so to be paid would cease on and after February 24, 1891. On March 19, 1891, Quintard surrendered the warrants 3 and 4, and received payment, to wit, $122,438.38, specified in the notice above mentioned. On September 16, 1891, another notice was sent to Quintard by the state treasurer advising him that the balance of warrant 5 would be paid on presentation, and shortly thereafter Quintard surrendered said warrant 5 and received the said balance, to wit, $43,627.95. On May 5, 1890, and pursuant to the joint writing of April 28, 1890, above quoted, delivered by Bailey and Quintard to complainant, Grannis, Bailey deposited with said Grannis 110 shares of the capital stock of the Minnehaha National Bank. Afterwards, and in said month of May, 1890, Quintard paid to Bailey, for said warrants, pursuant to said writings of April 28, 1890, above quoted, the sum of $168,300. This sum included the $12,000 mentioned in the second of said writings. After the tender of the bonds, as already mentioned, Bailey requested Grannis to redeliver the 110 shares of bank stock. Quintard objected to this, and Grannis filed his bill of interpleader. On January 21, 1892, a decree was entered in favor of complainant on this bill, finding that a case for an interpleader was made out, etc. The subsequent proceedings culminating in this hearing were to determine to which of said parties said bank stock belonged.

Quintard assumes the affirmative, and undertakes to make it appear that the real contract between himself and Bailey was that the bonds in question should be 4 per cent. bonds, and not 3½ per cents. His insistence is that such a term was omitted from the writings by a mutual mistake on the part of the contracting parties. He says that the state officials were at the time of the contract between himself and Bailey contemplating the issue of 4 per cent. bonds, and not 3½ per cent. bonds, and that such 4 per cent. bonds were, in reality, the subject-matter of the contract. The parties,

Bailey and Quintard, at the time of making their treaty in the city of Chicago, had before them the statute of South Dakota under which the bonds were to issue. It is not claimed that Bailey made any misrepresentation upon any point of fact or law which could have affected in any manner whatever Quintard's judgment or disposition to contract. Nor is it claimed that Bailey unfairly concealed or took advantage of any matter material to the transaction not brought to the notice of Quintard. I find that both Bailey and Quintard, when they made their contract of April 28th, expected, that is to say, predicted or judged, that the officials of South Dakota would issue 4 per cent. bonds, and not 3½ per cents. Four per cents would command a higher premium, and Quintard's profit in reselling the same would have been very much greater than in the case of the 3½ per cents. But the state officials had control of the matter. It was for them to fix the form of the bonds and the rate of interest. The chance that they might issue 3½ per cent. bonds was not covered by any provision in the writings. An expectation or anticipation on Bailey's part that the bonds would be 4 per cents is a very different matter from a contract by him insuring or guarantying that they would be 4 per cents. The evidence consists in large part of conversations, letters, telegrams, and memoranda, which I shall not review in detail. It is clear from such evidence that Bailey was disappointed and chagrined at the outcome, and that he anticipated trouble with Quintard. But there is no direct proof, and I cannot agree with the learned counsel for Quintard that any inference can be rightly drawn from the matters in evidence, to the effect that either Quintard or Bailey ever for a moment thought of a stipulation whereby Bailey was to insure or guaranty that the bonds should be 4 per cents.

It is urged, further, that the subject-matter of the contract was 4 per cent. bonds, that no such bonds ever issued, and hence that the contract was void. But the subject-matter of the contract was not 4 per cent bonds. The contract concerned the bonds to be issued under the statute. The mere assumption by the parties, with the statute before them, that the officials would issue 4 per cents rather than 3½ per cent. bonds, and the absence of any stipulation covering the contingency, does not make this case analogous to cases of that class wherein the parties make their agreement on the common mistake that the thing or subject-matter contracted about is still extant, when, in fact, but without the knowledge of either contracting party, said subject-matter has already been destroyed or extinguished. Nor is this a case where the consideration moving to Quintard can be said to have failed either in whole or in part. He was to receive the bonds issued pursuant to the statute. The possibility, evidently regarded by him as very slight, that the bonds might be 3½ per cents, instead of 4 per cents, was still incidental to the case. He bargained, in fact, for the chance, among other things, that the bonds would be 4 per cents. However unexpected and disappointing the event, it cannot be said that there has been any failure or partial failure of consideration. I may add that, if in the contract of April 28th there had been inserted an express

stipulation whereby Bailey guarantied or insured that the bonds should be 4 per cents, it is doubtful if such stipulation could have been enforced. A contract whereby a private person engages to control the acts of public officials, or even a wager with reference to such public acts, as I recollect the law, is usually held void as against public policy.

One feature of the case remains to be noticed. While the shares of stock in controversy have been in the hands of complainant, Quintard has paid an assessment of $1,127 thereon. I do not think he can be treated as a volunteer in doing this. I think the $2,035 tendered by Bailey, together with the $1,127, and interest on the latter sum, should be paid to Quintard. After making this payment, the stock in controversy should be turned over to the executors. A decree in accordance with this view of the case may, therefore, be prepared.